IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SAVIENT PHARMACEUTICALS, INC., *et al.*,[1] | Case No. 13-12680 (MFW) |
| Debtors. | Jointly Administered |
| | Hearing Date: December 4, 2013 at 10:30 a.m. (EST) |
| | Related Docket No. 16 |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
UNDER 11 U.S.C. §§ 105, 361, 362, 363, 507(b), FED. R. BANKR. P. 4001, 6004(h), 7062
AND 9014 AND DEL. BANKR. L.R. 4001-2 (I) AUTHORIZING THE DEBTORS
TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED NOTEHOLDERS, AND (III) SCHEDULING
FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(B)**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned proposed counsel, hereby objects to the Debtors' motion for a proposed order (the "Proposed Cash Collateral Order") authorizing the Debtors to use Cash Collateral, granting adequate protection to the Prepetition Secured Parties, and granting related relief (the "Cash Collateral Motion") [Docket No. 16],[2] and in support hereof, respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      In exchange for the Prepetition Secured Parties' consent to the use of cash collateral, but without offering new liquidity or funding, the Senior Secured Noteholders are

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Savient Pharmaceuticals, Inc. (3811) and Savient Pharma Holdings, Inc. (0701). The address of the Debtors' corporate headquarters is 400 Crossing Boulevard, 3rd Floor, Bridgewater, New Jersey 08807.

[2]    Each capitalized term that is not otherwise defined herein shall have the meaning ascribed to such term in the Cash Collateral Motion. The Debtors have not yet provided the Committee with a proposed form of final order. Accordingly, references hereunder to "Proposed Cash Collateral Order" shall refer to the Interim Cash Collateral Order, as may be conformed.

requesting inappropriate concessions as well as an extravagant adequate protection package.

Yet, no diminution in the value of the Senior Secured Noteholders' interests in their collateral

has been (or can be) proven, particularly where, as here, the Debtors' have determined to

monetize their assets under section 363 of the Bankruptcy Code, a stalking horse buyer is locked

in, the sale closing is expected to occur within a month, and the Senior Secured Noteholders are

simply utilizing cash collateral to bridge to that closing. Neither the Debtors nor the Senior

Secured Noteholders have articulated any operational event or risk that might engender

diminution in value. Indeed, the interim use of cash, whether it be for utilities, payroll, or even

professional fees, actually preserves, rather than diminishes, the value of the Senior Secured

Noteholders' collateral.

2.      Nonetheless, on the first day of these cases, the Senior Secured

Noteholders extracted a massive $8 million payment, which is grossly disproportionate to the

Debtors' assets on hand. To put that payment into perspective, $8 million represents nearly one-

third of the Debtors' available cash on hand as of the Petition Date and over seven times the

amount of non-default interest that would have otherwise accrued (though disallowable) under

the Senior Secured Notes Documents from the Petition Date through the sale closing. That

payment, in fact, actually places the Debtors in a far worse liquidity position and thus

jeopardizes the very collateral that the Senior Secured Noteholders are attempting to preserve.

3.      As if the $8 million payment were insufficient, the Senior Secured

Noteholders seek additional adequate protection in the form of the reimbursement of two sets of

lawyers, one for the Indenture Trustee for the Senior Secured Notes and another for an ad hoc

committee of Senior Secured Noteholders, even though no evidence has been offered that those

payments are in any way correlative to diminution in value. Absent proof of diminution in value

2

or evidence that the $8 million payment and the adequate protection liens and claims offered under the Proposed Cash Collateral Order are inadequate, such payments are impermissible under section 506(b) of the Bankruptcy Code.

4.      The Senior Secured Noteholders also propose to sweep *all* of the Debtors' cash upon the consummation of the sale, including not just the sale proceeds but any and all remaining cash (except for a wind-down budget that may turn out to be substantially under-funded).  Notably, this cash sweep is proposed to occur prior to the expiration of the Committee's investigation period, prior to the general bar date and prior to any plan.  If approved, the cash sweep could very well result in the risk of administrative insolvency, which risk would be borne by unsecured creditors.

5.      In addition to placing a liquidity choke-hold over these estates and ensuring that a rapid sale is the only outcome possible for these Debtors, the Senior Secured Noteholders are also seeking compensatory post-petition liens on all of the Debtors' unencumbered assets.  These assets may be the only source of recovery for unsecured creditors in these cases.  Indeed, the Committee is exploring potential estate claims that may exist, in addition to avoidance actions that may generate a recovery and must be preserved for the benefit of unsecured creditors.  The Senior Secured Noteholders, however, have also imposed a limited investigation period and restrictive Budget that offers a paltry amount for Committee professionals, clearly in an attempt to hamper the Committee's effectiveness.

6.      In short, the Senior Secured Noteholders have not extended new money and are merely consenting to the Debtors' use of cash to maximize the value of their own collateral.  Yet, the Cash Collateral Motion offers outsized benefits to the Senior Secured Noteholders, presents the potential risk of administrative insolvency engendered by the

3

$8 million payment and the pre-plan sweep of all cash, offers *no distribution* to any of the holders of more than $122 million of general unsecured claims, and effectively restricts the Committee's ability to investigate the liens and claims of the Prepetition Secured Parties. The sale process is being run for the sole and exclusive benefit of the Senior Secured Noteholders, yet the Senior Secured Noteholders refuse to pay the basic price of admission that would include, for example, adequate assurance of payment of administrative and priority claims such as section 503(b)(9) claims.

7.      Thus, the Proposed Cash Collateral Order is an anathema to the Bankruptcy Code. In the absence of evidence to support the adequate protection package being proposed, and in light of certain other infirmities that are described in more detail below, the Committee respectfully submits that the Proposed Cash Collateral Order is not consistent with the Bankruptcy Code, and is not in the best interests of the Debtors' estates.

## BACKGROUND

**A.    Business Overview**

8.      The Debtors are a specialty biopharmaceutical company, whose primary drug product, KRYSTEXXA®, treats adult patients with severe and chronic gout and who are resistant to conventional therapy. First Day Aff. ¶ 7. The drug is an intravenous infusion that is required to be administered at a doctor's office, hospital or infusion center because the label contains a black box warning for certain risks. *Id.* at ¶ 7. KRYSTEXXA® was approved for marketing, and designed as an "orphan drug," by the Food and Drug Administration, and became commercially available in 2010. *Id.* at ¶ 10.

9.      The use and ownership of certain patents and pending patent applications relating to KRYSTEXXA® are governed by an agreement by and among Savient Pharmaceuticals, Inc. ("SPI"), Duke University and Mountain View Pharmaceuticals, Inc., dated

as of August 12, 1998 (as amended, the "Duke/MVP Agreement"), pursuant to which the Debtors were granted the exclusive worldwide right to this patented technology, for which SPI pays quarterly royalty payments based on the sales of KRYSTEXXA®. *Id.* at ¶ 8. In addition to these rights under the Duke/MVP Agreement, the Debtors own or co-own U.S. and foreign patents and patent applications, which collectively form a broad portfolio of patents covering the composition, manufacture and methods of use and administration of KRYSTEXXA®. *Id.* at ¶ 8.

**B.    Capital Structure & Prepetition Exchange Transaction**

10.    The Debtors' capital structure purportedly consists of (a) approximately $145.4 million in accreted principal amount of senior secured discount notes due 2019 (the "Senior Secured Notes"), and (b) approximately $122.4 million in principal amount of unsecured convertible notes ("Convertible Notes"). First Day Aff. ¶¶ 17-18, 20. The amount of general unsecured claims is not yet readily ascertainable. The Debtors have not yet filed their schedules and statements of financial affairs, and the general bar date and employee bar date are proposed to be January 17, 2014 and February 28, 2014, respectively.

11.    The Convertible Notes were originally issued in the principal amount of $230 million. *Id.* at ¶ 20. However, according to the Debtors, the Senior Secured Notes were issued as part of a private exchange (the "Exchange Transaction"), pursuant to which certain holders of pre-existing Convertible Notes (the "Exchanging Holders") exchanged approximately $108 million in principal amount of pre-existing Convertible Notes for units of the Senior Secured Notes (at a discount) and warrants to purchase shares of common stock at an exercise price equal to $1.863 per share (*i.e.*, at or close to "in the money" warrants). *See id.* at ¶ 18. The Exchanging Holders also simultaneously purchased additional units of Senior Secured Notes and warrants for cash, resulting in the Debtors' receipt of net cash proceeds of approximately $43.1

5

million. *Id.* at ¶ 18. Pursuant to the Exchange Transaction, the holders of the Senior Secured

Notes were purportedly granted a security interest in substantially all of the assets of the Debtors

and the non-Debtor SPIL, as well as upstream guarantees from SPIL and SPHI. *Id.* at ¶ 19.

**C.      Events Leading to the Chapter 11 Cases**

12.     The Debtors' liquidity position substantially declined over recent years.

First Day Aff. ¶ 22. As suggested by the Debtors in their own first day pleadings, the

KRYSTEXXA® patient market may have been substantially over-estimated. *See id.* at ¶ 10.

Faced with high overhead and R&D costs associated with maintaining the drug, the Debtors

were unable to successfully commercialize the drug. *Id.* at ¶¶ 22-27.

13.     The Debtors indicate that in September 2013, the Debtors' management

produced an updated long term plan that assumed a stand-alone restructuring of the Debtors

based upon a potential "unprecedented new strategy," but which would require equitization of its

debt and a new money capital infusion. *Id.* at ¶ 30. The Debtors further describe that

management discussed alternative restructuring proposals, including the updated business plan,

with the Unofficial Committee of Senior Secured Noteholders, but the noteholders declined to

sponsor a stand-alone restructuring. *See id.* at ¶¶ 34, 37. The Debtors do not indicate whether

alternative restructuring proposals were solicited of any party (other than the Senior Secured

Noteholders), or whether others in the capital structure were presented with the new business

plan or might have been willing to sponsor a plan of reorganization that might, for example,

salvage significant NOLs and other tax attributes.

14.     Having been rebuffed by the Senior Secured Noteholders, it is apparent

from their first day pleadings that the Debtors determined to abandon pursuit of their new long-

range business plan, in favor of a quick sale for cash. *Id.* at ¶¶ 35-36. Consequently, the Debtors

6

determined to proceed with the terms of an acquisition with US WorldMeds as a stalking horse bidder, to be effectuated through a section 363 sale, subject to higher and better offers. *See id.* at ¶¶ 35-36.

15.    Consequently, on October 14, 2013 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, in order to implement the terms of the sale and conduct a sales process under the auspices of this Court.

16.    On October 24, 2013, the Office of the United States for the District of Delaware appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 81]. The Committee consists of the following entities: (i) CSC Trust Company of Delaware, as successor indenture trustee for the Convertible Senior Notes due 2018; (ii) Faith D. Ottery, M.D., PhD, FACN; and (iii) Riverside Contracting, LLC. The Committee thereafter selected Stroock & Stroock & Lavan LLP and Pachulski Stang Ziehl & Jones LLP, as co-counsel, and Mesirow Financial, as financial advisor, subject to approval from this Court.[3]

**D.    Proposed Sale and Bidding Procedures**

17.    The Debtors propose to sell their assets to the Purchaser Parties for approximately $55 million in cash, subject to certain Bidding Procedures (as defined in the Bidding Procedures Order) that have been approved by the Court. The proposed purchase price is subject to downward adjustment by an amount equal to the (a) amount of Cure Costs to be paid by the Purchaser Parties, and (b) the "Excess Sales Amount," *i.e.*, the amount by which net sales from August 1, 2013 through the closing date exceeds a prescribed formula. *See* Mot. Appr. Bid. Pros. Ex. D., § 1.6(a). In addition, the Debtors have agreed to exercise commercially reasonable efforts to cause their European Union license, which is held by a non-debtor

---

[3]    Retention applications for the Committee's professionals are pending before this Court [Docket Nos. 172-174].

subsidiary incorporated in Ireland (and which is the subject of an imminent liquidation proceeding), to be transferred to the Purchaser Parties for approximately $10,000. *See id.* at § 5.17.

18.     On November 4, 2013, this Court entered an order approving certain bidding procedures in connection with the sale process (the "Bidding Procedures Order") [Docket No. 110].  Qualified Bids (as defined in the Bidding Procedures Order) are required to be submitted no later than December 6, 2013; an auction is scheduled to take place on December 10, 2013; and a sale hearing is scheduled to take place on December 13, 2013 (the Committee's investigation deadline as currently proposed, however, is not set to expire until December 23, 2013).  *See* Bidding Procedures Order ¶¶ 4, 8, 11; Proposed Cash Collateral Order ¶ 21.

E.     **Cash Collateral Motion**

19.     On the Petition Date, among other first day relief, the Debtors filed the Cash Collateral Motion seeking interim use of Cash Collateral pursuant to the terms of the Proposed Cash Collateral Order, subject to compliance with an approved Budget and a number of restrictive terms and conditions.  Under the guise of "adequate protection," the Senior Secured Noteholders have sought: (i) a paydown of $8 million; (ii) post-petition liens on unencumbered assets (as well as assets subject to liens that may be vulnerable to Committee challenge); (iii) sale milestones that would require the Debtors to receive approval of the sale of substantially all of their assets by December 6, 2013, and the closing of such sale by December 31, 2013, or else an event of default is triggered; (iv) the immediate pre-plan sweep of the sale proceeds as well as all other cash (except for a likely inadequate wind-down budget and illusory "Buffer Amount") within two days following the sale closing; and (v) the reimbursement of two sets of counsel's fees.  The combined effect of those provisions (as discussed in detail below) is that these cases

8

are being run for the exclusive benefit of the Senior Secured Noteholders, to the detriment of unsecured creditors.

## OBJECTION

**A.      The Adequate Protection Payments Violate the Bankruptcy Code**

20.      The Proposed Cash Collateral Order provides for the payment of legal fees for both the Indenture Trustee and the Unofficial Committee of Senior Secured Noteholders, in each case without any showing as to the extent of any diminution in the value of collateral. *See* Proposed Cash Collateral Order ¶ 17(c). Consequently, these cash payments are impermissible under the Bankruptcy Code where, as here, the Senior Secured Noteholders are indisputably under-secured.

21.      Specifically, the Debtors have not satisfied their burden of demonstrating that all such periodic cash payments are designed to compensate the Prepetition Secured Parties for the diminution in the value of their collateral, as prescribed by section 506(b) of the Bankruptcy Code and the Supreme Court's decision in *Timbers*. Section 506(b) of the Bankruptcy Code provides that a holder of a secured claim can only receive current payments of post-petition interest, fees, and costs to the extent such holder's secured claim is over-secured. *See* 11 U.S.C. § 506(b) (providing for "reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose," but only "[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim . . . ."). Courts have found the negative implication to be true as well, namely that under-secured creditors are *not* entitled to receive post-petition interest or legal fees in the guise of adequate protection (as is being attempted here). *See, e.g., United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988).

9

22.    In *Timbers*, the Supreme Court denied an under-secured creditor's request for the payment of post-petition interest as adequate protection. *See id.* at 382. The Supreme Court observed that allowing post-petition interest to under-secured creditors under the pretext of adequate protection would render section 506(b) meaningless and disregard congressional intent behind that provision. *See id.* at 372-73; *Baybank-Middlesex v. Ralar Distribs., Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995) ("We need not determine whether there was a failure of adequate protection because . . . Baybank, as an under-secured creditor, is not entitled to postpetition interest and fees under § 506(b) . . . .").

23.    This precise issue was litigated in the Trump hotel and casino chapter 11 case. *See In re TCI 2 Holdings, LLC*, No. 09-13654 (JHW) (Bankr. D.N.J. 2009). In that case, the Bankruptcy Court upheld an objection from Donald Trump to a request by an ad hoc second lien noteholder committee for the payment of professional fees as adequate protection. The Court found that the payment of professional fees to the ad hoc committee, as under-secured creditors, was not a proper form of adequate protection and would violate section 506(b) of the Bankruptcy Code. *See* Transcript of March 17, 2009 Oral Argument at 71-76, *In re TCI 2 Holdings, LLC*, No. 09-13654 (JHW) (Bankr. D.N.J. 2009).[4] The Bankruptcy Court ultimately found that, to the extent the secured noteholders were entitled to payment of professional fees as adequate protection, such adequate protection must be limited to the actual diminution of their interest in their collateral. *See id.*

24.    Here, no evidence has been presented to demonstrate the appropriateness of the $8 million payment or that such amount, on top of other cash payments contemplated under the Cash Collateral Motion, is in any way correlative to diminution in the value of the Prepetition Collateral during the expedited case timeline proposed by Debtors. To the contrary,

---

[4]    A copy of the relevant transcript is attached hereto as Exhibit A.

DOCS_DE:190504.1 77170/001

the use of cash collateral to maintain the going concern value of a debtor's business preserves, rather than diminishes, the value of that collateral. *See, e.g.*, *In re Pine Lake Vill. Apartment Co.*, 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) ("The protection and maintenance of the plaintiff-mortgagee's collateral . . . clearly ensures that the plaintiff-mortgagee's investment is adequately protected.").

  25. Here, all or substantially all of the Cash Collateral budgeted for use during the 13 week Budget period—utilities, taxes, payroll, and even a substantial portion of professional fees—will serve to maintain or enhance the value of the Prepetition Secured Parties' collateral by enabling the sale of the Debtors' assets through an orderly section 363 sale process.[5] Indeed, the Debtors themselves acknowledge that "[t]he Debtors have an immediate and critical need to use the Prepetition Collateral, including the Cash Collateral, in order to, among other things, permit the orderly continuation of their business, maintain and generate the confidence of patients, prescribing doctors and distributors, comply with the terms of the Acquisition Agreement, and preserve the going concern value of the Debtors." Proposed Cash Collateral Order ¶ 6(b).

  26. Even were the Court to determine the potential risk of diminution in value, the Debtors have not even attempted to establish (nor could they) that the $8 million payment, combined with the Adequate Protection Liens (as modified herein) and 507(b) Claims (each as

---

[5] For similar reasons, the Proposed Cash Collateral Order's formulation of "diminution in value" is flawed. The Proposed Cash Collateral Order purports to afford the Prepetition Secured Parties various forms of adequate protection in an amount equal to "the aggregate diminution on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value, *(ii) the Debtors' use of Cash Collateral and other Prepetition Collateral* and (iii) the imposition of the automatic stay, pursuant to section 362 of the Bankruptcy Code." Proposed Cash Collateral Order at ¶ 17 (emphasis added). The second clause lends itself to the untenable argument that diminution in value occurs on a dollar for dollar basis for every cash dollar burned during the pendency of these cases. For the reasons described above, that is simply not the case. The second clause might also lend credence to the absurd argument that the depletion of cash resulting from the $8 million paydown and the costs of the Prepetition Secured Parties' own professionals should be viewed as diminution in value of collateral. Accordingly, that clause should be stricken.

11

defined below), offer insufficient adequate protection.  To put the $8 million prepayment in perspective, the payment represents nearly one-third of available cash on hand as of the Petition Date, and exceeds by more than $6 million (over seven times) the total amount of non-default interest that would have otherwise accrued (though disallowable) under the terms of the Senior Secured Notes Documents during the period following the Petition Date through the anticipated sale closing date.  The Debtors have made no showing that the Prepetition Secured Parties are not adequately protected.

27.    To the extent the Court determines that the Prepetition Secured Parties are entitled to receive cash payments as a form of adequate protection, and such amounts do not correspond to actual diminution in value of their collateral, then such amounts should be applied to reduce the *secured* portion of the Prepetition Secured Parties' claim.  Absent an actual showing of diminution in value, any adequate protection payments received by an undersecured lender should be applied against the secured portion of the lender's claims because "adequate protection payments . . . serve as a kind of prepayment of the secured claim." *In re Markos Gurnee P'Ship*, 252 B.R.712, 719 (Bankr. N.D. Ill. 1997) (reducing undersecured lender's secured claim by the amount of adequate protection payments not needed to offset a decline in value); *see In re Spacek*, 112 B.R. 162, 165 (Bankr. W.D. Tex. 1990) ("[S]ince the value of the collateral has not decreased during the case, the adequate protection payments made to Bank during the case must be applied against the secured portion of Bank's indebtedness.").  Allowing such payments to be applied to the unsecured portion of the claim would provide the secured creditor with a greater recovery on account of its secured claim than it would have been entitled to outside of bankruptcy. *See In re Spacek*, 112 B.R. at 165.  Such a payment would be akin to

12

paying an unsecured claim outside the context of a chapter 11 plan and affording such claim a greater recovery than other unsecured claims.[6]

**B.     Immediate Pre-Plan Cash Sweep Is Inappropriate**

28.     The Prepetition Secured Parties are requesting that *all* of the Debtors' cash be swept within two business days following the closing of the Sale, other than (1) amounts contained in the Budget, and (2) a $2 million "Buffer Amount." Proposed Cash Collateral Order ¶ 17(e). That Buffer Amount appears to be illusory because those funds are required to be placed into a segregated account and may only be used "in accordance with and subject to the terms of [the Proposed Cash Collateral] Order" and upon the consent of the Unofficial Committee of Senior Secured Noteholders, in their sole discretion. *See id.* at ¶ 17(e). Presumably, any residual amount will also be swept by the Prepetition Secured Parties.

29.     Yet, no evidence has been (or can be) adduced that a sweep of all available cash is necessary to protect against diminution in value of collateral, as opposed to awaiting confirmation of a plan. In fact, the cash sweep, after giving effect to the $8 million drain that occurred day-one, could place these estates on the brink of administrative insolvency. To the extent the Debtors will not be able to freely access the Buffer Amount, the only cash left in the estate following the sale will be the amounts contained in the Budget, which must at least be sufficient to cover reasonable estimates of any administrative and priority claims if the Debtors expect to confirm a liquidating chapter 11 plan. Upon review of the Budget, however, the Debtors are at great risk of no longer having sufficient funds to make necessary plan payments. Although the Budget includes some post-sale accrual amounts, the Budget does not provide for, among other things, any payments on account of priority tax claims or section

---

[6]     The Committee reserves the right to seek to disgorge any cash payments made in the event the Prepetition Secured Parties' liens are subsequently avoided or subordinated.

13

503(b)(9) claims, or any tax claims accruing after the sale. Moreover, the general bar date does not occur until January 17, 2014, the administrative bar date (only for claims arising through year-end) does not occur until February 18, 2014, the employee bar date does not occur until February 28, 2014, and the governmental bar date does not occur until April 14, 2014. Thus, any current estimates may be premature, if not unreliable. Consequently, to the extent any unexpected claims are filed that were not included in the Budget, the Debtors will not have the cash to pay those claims, absent appropriate planning at this stage in the cases. Additionally, as described below, the Budget does not contemplate the payment of *any* professional fees for the Committee accruing after the sale.[7]

   30. In light of the risk of administrative insolvency, precipitated largely by the $8 million drain on the first day of these cases, the cash sweep should not be permitted until after the Committee's investigation has completed and the liens of the Prepetition Secured Parties are no longer subject to Challenge (defined below), the Debtors and the Committee are in a meaningful position (which they are not today) to formulate a reasonable wind down budget, and a plan has been confirmed. Indeed, as noted above, the Committee has identified several areas for further inquiry into the scope, validity and enforceability of certain of the liens and claims asserted by the Prepetition Secured Parties. To the extent the Prepetition Secured Parties wish to benefit from an orderly sales process, one that presumably will allow them to monetize their collateral for more than would otherwise be achieved in a chapter 7 liquidation, then adequate

---

[7] The Budget contemplates $270,000 for "Operational Wind-Down Expenses"; however, the Debtors have not included a line item breakdown of each of those estimated expenses. Accordingly, the Committee is not in a meaningful position to assess the reasonableness of the wind down budget.

provision must be made in the Budget to ensure that other creditors are not left holding the proverbial bag once the sale closes.[8]

C.    **The Committee Professional Fee Budget Is Punitive**

31.    In addition to omitting and potentially understating amounts required for post-sale operations, the Committee professional fee budget is woefully inadequate, and is clearly designed to hamper the Committee's effectiveness.  Committee professionals (both legal and financial, together) are budgeted to incur only $160,000 in fees and expenses through December 2013—in contrast to the Debtors' professionals, who are permitted to incur up to $7.65 million in fees and expenses for the same period, and in contrast to the professionals for the Indenture Trustee and the Unofficial Committee of Senior Secured Noteholders, who are projected to incur $1.2 million in fees and expenses for the same period.

32.    To make matters worse, the Committee professionals are not permitted to incur *any* fees or expenses after December 2013—in contrast to the Debtors' professionals, who are permitted to incur up to $1.55 million in fees and expenses for the same period, and in contrast to the professionals for the Indenture Trustee and the Unofficial Committee of Senior Secured Noteholders, who are projected to incur $480,000 in fees and expenses for that same period (even though the Prepetition Secured Parties, by then, will have supposedly swept all available cash).  Thus, the Committee would be unable to have its professionals even review or comment on a proposed plan, let alone participate in the creation of the liquidating trust (which will presumably include unencumbered assets such as estate causes of action) or oversee the claims reconciliation process.  Additionally, the "Carve-Out" for the reimbursement of Committee professionals for fees incurred after a Termination Event is tied to the pre-

---

[8]    Given the potential risk of administrative insolvency, nothing in the Proposed Cash Collateral Order should prevent an examiner, chapter 11 or chapter 7 trustee from bringing the types of claims or challenges that may be pursued by the Committee.

termination Budget and is woefully inadequate.[9]  *See* Proposed Cash Collateral Order ¶ 9.  Thus,

the Committee professional fee budget and "Carve-Out" are each patently insufficient and must

be increased to allow Committee professionals to adequately represent the interests of unsecured

creditors.

D.    **The Investigation Budget and Proposed Lien Challenge Period Are Both Inadequate, and the Committee Should Be Afforded Standing to Commence Avoidance Actions**

33.    The Debtors propose that, within 60 days from the date of formation of the

Committee (the "Challenge Period"), the Committee must (i) investigate the Prepetition Secured

Parties' liens and claims; (ii) file a motion to obtain standing and obtain a Court order in respect

of same; and (iii) commence a challenge (a "Challenge").  *See* Proposed Cash Collateral Order ¶

21.  That timetable is unreasonable.  Given the Debtors' transactional history as well as the

complex nature of the collateral, which implicate various scientific and intellectual property

issues associated with KRYSTEXXA®, the proposed Challenge Period of 60 days should be

increased to 90 days from the entry of the final order to provide the Committee with sufficient

time to conduct a proper investigation.  The Committee should also be permitted to extend the

Challenge Period for cause shown upon an order of this Court.  Indeed, the Committee believes

that additional time is necessary to explore certain potential claims or causes of action, including,

without limitation, those described below.

a.    *Exchange Transaction:*

34.    The Committee is in the process of investigating whether any potential

causes of action exist in connection with the Exchange Transaction.  As noted above, pursuant to

the Exchange Transaction, approximately $108 million in principal amount of pre-existing

---

[9]    It is also unclear whether the line item "Restructuring Costs" is subject to variance testing or how that line item works in relation to other line items in the Budget.  *See* Proposed Cash Collateral Order ¶ 8.

16

unsecured and non-guaranteed Convertible Notes were exchanged for units comprised of Senior Secured Notes (at a discount) and "at-the-money" warrants to purchase shares of common stock. See First Day Aff. ¶ 18. Also, pursuant to the Exchange Transaction, the Exchanging Holders purchased additional units of Senior Secured Notes and warrants for cash, resulting in the Debtors' receipt of net cash proceeds of approximately $43.1 million. *Id.* at ¶ 18.

35.    Notably, the Exchange Transaction was not open to all holders of Convertible Notes. Further, the Convertible Notes did not contain any negative covenants, and, upon information and belief, no waiver or forbearance was issued (or appears to have been necessary) as part of the Exchange Transaction. Moreover, though the maturity of the exchanged portion of notes was extended by approximately 15 months and the new notes were issued at a discount (albeit at a premium to the then-current trading prices of the Convertible Notes), the new notes provided for a nominal decrease in interest expense (from 4.75% to 3.00% per annum) for only three years until May 9, 2015, and thereafter a significant increase in interest expense to 12% per annum for the next four years through May 9, 2019. Thus, the Committee is investigating whether the Debtors received reasonably equivalent value in exchange for the new liens and upstream guarantees issued as part of the exchange, as well as considering information relevant to establishing the Debtors' financial condition at the time of the transfers. The Committee is also investigating whether the claims of the Senior Secured Noteholders may be subject to partial disallowance as a result of any original issue discount imputed to the new Senior Secured Notes as a result of the issuance of the warrants as part of the exchange investment package offered (or otherwise).

b.      *Lien Investigation:*

36.      In addition, the Committee is in the process of analyzing and investigating the nature, extent, validity and enforceability of the liens and security interests purportedly granted to the Prepetition Secured Parties.  Preliminarily, the Committee has identified the following assets that either were excluded from the Senior Secured Noteholders' collateral package or which (subject to further diligence) require additional focus and/or may be potentially vulnerable to challenge: (a) D&O insurance policies and the proceeds thereof, (b) 35% of the parent-Debtor's equity interests in its foreign subsidiary, SPIL, which holds the license to market KRYSTEXXA® in the European Union, (c) foreign intellectual property, (d) Commercial Tort Claims, including avoidance actions and, arguably, the Debtors' interest in a $1.4 million litigation against CVS (among other potential third party claims held by the Debtors) and, potentially, (e) SPI's interests in the Duke/MVP Agreement (and the proceeds thereof), pursuant to which SPI licenses an integral, if not inextricable, component of the KRYSTEXXA® drug from certain licensors whose consent to the grant of liens in the Debtors' interests in the license agreement was not obtained.  The Committee also understands that certain of the patents that comprise the KRYSTEXXA® drug are co-owned. First Day Aff. ¶ 8.  The Committee is in the process of investigating whether the terms of any co-ownership agreement preclude the pledge or assignment of the Debtors' interests in any such patents.

37.      For similar reasons, the investigation budget for the Committee should be increased from $50,000 to $100,000.  The Committee should further be able to satisfy any unpaid investigation costs above the allotted Budget from unencumbered assets.  Moreover, due to the rapid timeline of these cases, notably the expected sale closing on December 16 whereupon all cash in the estate is proposed to be swept, and in order to avoid unnecessary

18

litigation and preserve cash, the Proposed Cash Collateral Order should provide the Committee with automatic standing to bring any Challenge (or, at minimum, the Challenge Period should be tolled once a standing motion is filed). The Prepetition Secured Parties cannot run the clock out on the Committee by sweeping all cash before the Challenge Period has ended and without allowing the Committee to obtain the necessary standing to commence any Challenges.

**E.      The Proposed Scope of Adequate Protection Liens and 507(b) Claims Are Inappropriate**

38.      As adequate protection, the Prepetition Secured Parties seek (1) post-petition first priority security interests (the "Adequate Protection Liens") in all "Post-Petition Collateral," which includes (a) certain unencumbered assets as well as other assets in which the Prepetition Secured Parties may not have a valid or perfected lien (as described below), and (b) causes of action under sections 502(d), 544, 545, 547, 548, 550 or 553 of the Bankruptcy Code (collectively, "Avoidance Actions") and the proceeds thereof, and (2) super-priority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code ("507(b) Claims") allowable against each of the Debtors on a joint and several basis. *See* Proposed Cash Collateral Order ¶ 17(a)-(b).

39.      As a threshold matter, the Prepetition Secured Parties should not be entitled to post-petition liens in unencumbered assets or in assets subject to a lien that is subsequently voided or subordinated by the Court. As described above, the Committee has identified certain liens or security interests that may be potentially vulnerable to a Challenge. Granting post-petition liens or super-priority claims in those assets would defeat the purpose of any potential Challenge brought by the Committee and vitiate any potential remedies otherwise available to the Committee.

DOCS_DE:190504.1 77170/001

40.    Avoidance actions are uniquely for the benefit of general creditors of the estate, not secured creditors. The intent behind avoidance powers and a debtor's power to bring causes of actions is to allow the debtor-in-possession to gain recoveries for the benefit of all unsecured creditors. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship. IV*, 229 F.3d 245, 250 (3d Cir. 2000); *In re Sweetwater*, 55 B.R. 724, 732-33 (D. Utah 1985), *rev'd in part*, 884 F.2d 1323 (10th Cir. 1989) (avoiding powers are meant to benefit creditors generally and promote equitable distribution among all creditors). To allow the Debtors, as fiduciaries, to use their powers to effectively assign the benefits of certain causes of action and related estate claims and proceeds to the Senior Secured Noteholders, as opposed to true representatives of the estates for the benefit of unsecured creditors, turns bankruptcy law on its head. *See Tenney Village Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (debtor in possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit" of the secured creditor). The Court should not condone this end-run around what could likely be the only sources of meaningful recovery for unsecured creditors.

41.    Accordingly, the Committee respectfully requests that the Avoidance Actions and the proceeds thereof be excluded from the scope of the Adequate Protection Liens and the 507(b) Claims, and that the following language (which is consistent with recent precedent before this Court) be inserted into the order:

> Notwithstanding anything contained herein to the contrary, in the event that any or all of the liens, security interests or claims of the Prepetition Secured Parties are voided, avoided, disallowed, subordinated or determined to be invalid, then any lien or priority claim granted to any of the Prepetition Secured Parties under this Order shall be voided, avoided, disallowed, subordinated or rendered invalid to the same extent, and no provision hereof shall

20

preclude or impair the Court from imposing any appropriate remedy in such event.

**F.    Waivers Under Sections 552(b) and 506(c) Are Inappropriate**

42.    The proposed waiver of rights under sections 506(c) and 552(b) of the Bankruptcy Code, including the waiver of the equitable doctrine of marshaling, are inappropriate in a case such as this, where the chapter 11 process is being run solely for the benefit of the secured lender, to the detriment of unsecured creditors.  This contravenes the essential purpose of section 506(c).  *See Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . .  The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . . .") (internal citation omitted); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

43.    Neither the Committee nor this Court has any assurances that the proposed wind-down budget will be sufficient to pay any and all administrative claims against the Debtors' estates.  For example, the Budget does not contain a line item that provides for the payment of section 503(b)(9) claims, which are entitled to administrative priority claim status.  The section 506(c) surcharge waiver is not appropriate if it is the Debtors' intention to remain in chapter 11 only so long as it takes to conclude a fast sale on a basis that will leave many unpaid administrative liabilities.

44.    As Bankruptcy Courts have recognized, when approving financing that contains a surcharge waiver, a debtor must submit evidence that administrative claims, including 503(b)(9) claims, will be paid in full. *See* Transcript of July 13, 2019 Hearing, *NEC Holdings Corp.*, Case No. 10-11890 (PJW) (Bankr. D. Del. 2010) (No. 22), at 108 ("But I need some evidence that there's a probability that admin claims are going to be paid in full, including 503(b)(9) claims or I won't approve the financing."). Courts routinely reject the waiver of surcharge rights under section 506(c). *See, e.g., Hartford Fire Ins. Co. v. Nw. Bank Minn., N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 175-76 (8th Cir. B.A.P. 1998) (holding that provision in financing order purporting to immunize the postpetition lender from section 506(c) surcharges was unenforceable); *In re Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve postpetition financing agreement to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy code by prohibiting any surcharge of collateral under section 506(c)).

45.    The waiver of section 506(c) rights is inappropriate where, as here, the Debtors and their estates are not receiving any additional liquidity and, for the privilege of using the Prepetition Secured Parties' Cash Collateral, are being required to grant a litany of excessive adequate protection.

46.    Moreover, the Debtors cannot, at this incipient stage of the chapter 11 cases, foresee future events and foreclose what the "equities of the case" may be or adduce any evidence at this time sufficient to assess the impact of the elimination of such a remedy. To the extent the Debtors expend unencumbered assets for the exclusive benefit of secured lenders, the statutory protections afforded by sections 552(b) and 506(c) should be fully preserved.

**G.      Certain Provisions Within the Proposed Cash Collateral Order Are Inappropriate**

47.      *Scope of Debtors' Releases Are Too Broad:*  The Debtors purport to release a host of "Releasees" related to the Prepetition Secured Parties (in their capacities as such), with respect to any of the "Prepetition Obligations, *Prepetition Collateral*, the Senior Secured Note Documents or the transactions contemplated under such documents . . . ." Proposed Cash Collateral Order ¶ 5(f).  The Committee is concerned that the italicized language could be viewed as exculpatory language, releasing the Releasees with respect to all matters related to the Debtors, as opposed to being limited to the Senior Secured Notes and the Prepetition Obligations.  Moreover, the limitation of liability in paragraph 25 of the Proposed Cash Collateral Order appears broad insofar as it offers an immediate release, without regard to the Committee's investigation, of "any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors."  Proposed Cash Collateral Order ¶ 25.  This, too, is broad, and should be subject to the Committee's investigation.

48.      *Improper Findings Have Been Requested of this Court:*  The Proposed Cash Collateral Order requests that the Court issue "good faith" findings under sections 105(a), which seems out of context here, as well as sections 363(m) and 364(e), neither of which is appropriate as the Prepetition Secured Parties are not purchasers or lessees of estate property and are not extending new credit.  *See* Proposed Cash Collateral Order ¶¶ 6(d), 20(c).

49.      *Committee Should Be Added to Certain Notices/Reporting Obligations:* Counsel to the Committee should be simultaneously provided with a copy of any Carve-Out Notice.  *See* Proposed Cash Collateral Order ¶ 9.  In addition, counsel to the Committee should also receive a copy of all Budget Reconciliations, and the Committee should be entitled to request such other financial and other reporting information (and receive copies of information

23

requested by the Unofficial Committee of Senior Secured Noteholders) provided for in paragraph 17(d) of the Proposed Cash Collateral Order.

50.    *Termination Events:* The Proposed Cash Collateral Order contemplates a number of Termination Events pursuant to which the use of Cash Collateral expires automatically, without further notice or court proceeding. *See* Proposed Cash Collateral Order ¶ 10.  At the very least, other than with respect to the milestones, each of the Debtors and counsel to the Committee should receive prior written notice of the occurrence of any event which constitutes, or after the passage of time may constitute, a Termination Event.[10]  In addition, the Termination Event described in paragraph 10(f), *i.e.*, the prohibition against the payment of pre-prepetition claims, should be subjected to some materiality threshold (for example, $50,000 individually or $500,000 in the aggregate).  Also, the Proposed Cash Collateral Order provides that the use of Cash Collateral could terminate as early as December 10, 2013 to the extent that, no later than one month prior to the expiration of the 13-Week Budget, the Unofficial Committee of Senior Secured Noteholders, acting in its commercially reasonable discretion, has not approved a Supplemental Budget for the following 13-week period. *See* Proposed Cash Collateral Order ¶ 7(b).  The Committee submits that the Supplemental Budget should be deemed acceptable if consistent with prior business practices and otherwise commercially reasonable from the Debtors' perspective.  Finally, the sale-related milestones must be conformed to the dates and deadlines scheduled by the Bidding Procedures Order.

---

[10]    In addition, the application of any Collateral proceeds upon the exercise of remedies, see Proposed Cash Collateral Order ¶ 12, should be subject to the Committee's investigation and potential clawback.  In a similar vein, paragraph 15 of the Proposed Cash Collateral Order, which provides that all payments and proceeds remitted to the Prepetition Secured Parties shall be received free and clear, should also be subject to the Committee's investigation and potential clawback. *See* Proposed Cash Collateral Order ¶ 15.

24

## **RESERVATION OF RIGHTS**

51.     The Committee reserves the right to raise further and other objections or responses to the Proposed Cash Collateral Order, any other form of order presented by the Debtors, or any pleadings filed by any parties in interest, prior to or at the hearing to consider the Cash Collateral Motion.  All rights and remedies of the Committee with respect to the Cash Collateral Motion and the Proposed Cash Collateral Order are hereby expressly reserved.  In addition, the Committee reserves any and all rights and remedies with respect to the Debtors' section 363 sale process and any sale hearing in these cases.

25

WHEREFORE, the Committee respectfully requests that the Court condition its approval of the Cash Collateral Motion upon the foregoing, and grant the Committee such other and further relief as the Court may deem just and proper.

Dated: November 25, 2013
      Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

Bradford J. Sandler (DE Bar No. 4142)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone:    (302) 652-4100
Facsimile:     (302) 652-4400
E-mail:        bsandler@pszjlaw.com
               joneill@pszjlaw.com
               pkeane@pszjlaw.com

-and-

**STROOCK & STROOCK & LAVAN LLP**
Kristopher M. Hansen
Erez E. Gilad
Matthew G. Garofalo
180 Maiden Lane
New York, NY 10038-4982
Telephone:    (212) 806-5400
Facsimile:     (212) 806-6006
E-mail:        khansen@stroock.com
               egilad@stroock.com
               mgarofalo@stroock.com

Proposed Co-Counsel to the Official Committee of Unsecured Creditors